FILED
U.S. DISTRICT COURT
EASTERN DISTRICT ARKANSAS

OCT 3 0 2020

JAMES W. McCORMACK, CLERK
By:_____
                    DEP CLERK

IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
CENTRAL DIVISON

BARBARA ADAMS, AS ADMINSTRATRIX
OF THE ESTATE OF DOUGLAS ADAMS, DECEASED

*Plaintiff*

v.

UNITED STATES OF AMERICA

*Defendant*

Civil Case No. 4:20CV1297-BRW

This case assigned to District Judge *Wilson*
and to Magistrate Judge *Deere*

---

**COMPLAINT FOR DAMAGES UNDER THE FEDERAL TORT CLAIMS ACT**

---

Plaintiff Barbara Adams, as Administratrix of the Estate of Douglas Adams, deceased, by and through her attorneys, The Law Offices of J. Reid Byrd, PLLC, and Reed Firm, P.A., for her Complaint against the United States of America, states as follows:

## I. INTRODUCTION

1.     This is a negligence action against Defendant United States of America under the Federal Tort Claims Act ("FTCA") (June 25, 1946, ch. 646, Title IV, 60 Stat. 812, 28 U.S.C. Pt.VI Ch.171, 28 U.S.C. § 2671 *et seq.*, 28 U.S.C. §§ 2671 – 2680, 28 U.S.C. § 1346(b), 28 U.S.C. §§ 1402(b) and 2401(b)).

2.     Douglas Adams was an inmate at the Federal Correctional Institute ("FCI") located at 4001 Leopard Drive in Texarkana, Texas, incarcerated for a nonviolent offense related to a probation violation. During his stay as an inmate, FCI had actual knowledge that Mr. Adams was diagnosed with a painful, high-grade metastatic cancer – a serious medical need, mandating urgent treatment.

1

3. Despite FCI's firsthand knowledge, FCI failed to use reasonable care to provide treatment and standard medical care for Mr. Adams's cancer for nearly eight (8) months while Mr. Adams remained incarcerated and in the sole control of the United States of America.

4. Despite FCI's firsthand knowledge of Mr. Adams's cancer, FCI failed to provide reasonable care to treat Mr. Adams's cancer, failed entirely to provide down-staging therapy, and blatantly ignored a serious medical need, mandating treatment, causing the condition to worsen, which ultimately caused Mr. Adam's death on September 4, 2018.

5. A prison official is deliberately indifferent if she knows of and disregards a serious medical need or a substantial risk to an inmate's safety. *Saylor v. Nebraska*, 812 F.3d 637, 644 (8th Cir. 2016). Thus, the Eighth Amendment protects inmates who have a serious medical need from deliberate indifference to that serious medical need.

6. Here, FCI, prison officials, Federal Bureau of Prisons ("BOP") employees, and other employees of the United States of America were deliberately indifferent because they had actual knowledge of Mr. Adams's serious medical need for urgent treatment for his high-grade metastatic cancer, which posed a substantial risk to his safety, and despite that knowledge, deprived Mr. Adams of any substantive cancer treatment.

7. Not every physical condition constitutes a serious medical need. "A serious medical need is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Youmans v. Gagnon*, 626 F.3d 557, 564 (11th Cir. 2010). The FTCA and the Eighth Amendment prohibit such acts as ignoring the serious medical condition, making the condition worse due to negligence, or being deliberately indifferent to the serious medical need.

8.    Here, FCI, prison officials, BOP officials, and other employees of the United States of America had firsthand knowledge of pathology reports from multiple physicians, including oncologist, Dr. Ed Eichler, ordering mandated treatment and recommending immediate transfer for down-staging therapy, commonly known as chemotherapy and radiation treatment.

9.    Despite multiple physicians' orders and recommendations, none of the recommended treatment was provided, nor was a transfer for cancer treatment ever provided to Mr. Adams while he was incarcerated and in the sole control and custody of the United States of America.

10.    The United States of America knowingly placed Mr. Adams on a medical hold for cancer, despite multiple physicians mandating a transfer for urgent cancer treatment and recommending urgent downstaging therapy, and the United States of America knowingly disregarded those physicians' orders by repeatedly failing to transfer Mr. Adams, repeatedly failing to treat Mr. Adams with down-staging therapy, and repeatedly failing to provide any substantive cancer treatment, while simultaneously keeping him under a medical hold due to his cancer diagnosis, constituting cruel and unusual punishment, negligence, and deliberate indifference, in violation of the FTCA and the Eighth Amendment of the United States Constitution.

## II. PARTIES

11.    Plaintiff is a resident of, and is domiciled in, White County, Arkansas.

12.    Defendant United States of America is responsible under the FTCA for the negligence of its employees of the federal government, including the BOP, which is within the Department of Justice ("DOJ"), on the basis of vicarious liability or *respondeat superior*. This

3

matter concerns certain federal government employees, acting within the scope of their office or employment with the BOP Division of the DOJ, within the United States Government.

### III. JURISDICTION AND VENUE

13.    Because the negligence detailed herein triggered the FTCA, Plaintiff provided her initial administrative claim to the BOP on behalf of her son, Mr. Adams.

14.    Plaintiff presented a Standard Form 95 and Addendum, an Authorization of Legal Representation, and her Letters of Administration, *see* "Exhibit A," to the BOP, located at 320 1st St. NW, Washington, DC 20534, in accordance with the FTCA. These materials were delivered via UPS on November 14, 2019. *See* "Exhibit B." Plaintiff's administrative claims were therefore filed with the appropriate federal agency, the BOP, in accordance with 28 U.S.C. § 2675 of the FTCA.

15.    Plaintiff has fully complied with 28 U.S.C. § 2401 and 28 U.S.C. § 2675, and the BOP has failed to respond to Plaintiff's administrative claim and submission for damages in the amount of $1,000,000.  As a result of the presumed final administrative agency denial of Plaintiff's claim, Plaintiff has fully exhausted her remedy through the administrative office of the BOP. Thus, this Court has exclusive jurisdiction over the subject matter, pursuant to 28 U.S.C. § 1346(b)(1), and may consider the claims brought herein under the FTCA.

16.    Plaintiff resides in White County, Arkansas, located in the Eastern District of Arkansas. Venue is therefore proper under 28 U.S.C. § 1391.

### IV. FACTS

17.    On July 31, 2017, a scrotal ultrasound was performed on Mr. Adams at St. Michael Health System that revealed an irregularity in Mr. Adams's left testicle. The impression reads: "[T]he appearance is primarily worrisome for malignancy."

4

18.    On August 1, 2017, BOP employee, Jeremy Dougan, FNP, received the scrotal ultrasound, reviewed it, and wrote a BOP Clinical Encounter – Administrative Note identifying the worry for malignancy.

19.    Mr. Adams was set for release to a halfway house on September 26, 2017.

20.    However, on September 21, 2017, Mr. Adams was placed on a medical hold for the malignancy in his left testicle and scheduled for a left orchiectomy to remove the testicle. As a result, Mr. Adams was denied release to his mother's custody or a halfway house.

21.    On September 29, 2017, the orchiectomy on the left testicle was performed. The Final Surgical Pathology Report confirmed a Stage 3 – High Grade, well-differentiated sarcoma and paratesticular dedifferentiated liposarcoma with round cell liposarcoma and pleomorphic sarcoma-like features.

22.    Cancer was confirmed in Mr. Adams's body by pathology report by at least September 29, 2017.

23.    On the same day, after surgery, Mr. Adams had a clinical encounter with BOP employee, Mike Rostollan, RN, but there is no mention of Mr. Adams's confirmed cancer pathology.

24.    On October 1, 2017, Mr. Adams had a clinical encounter with BOP employee, Mike Rostollan, RN, but there is no mention of Mr. Adams's confirmed cancer pathology.

25.    On October 6, 2017, Mr. Adams had a clinical encounter with BOP employee, Jeremy Dougan, FNP, who noted: "We are waiting Path results before we can remove the medical hold."

26.    On October 9, 2017, the Final Surgical Pathology Report was signed and approved by Dr. Todd Payne with Collom & Carney Association.

27.    On October 10, 2017, BOP employee, Jeremy Dougan, FNP, wrote a Clinical Encounter – Administrative Note that states: "**Urology has called and notified that his pathology results show liposarcoma**. Pt will need to have CT of abd/pelvis." (emphasis supplied).

28.    Ten days later, on October 20, 2017, BOP employee, Jeremy Dougan, FNP, reviewed the CT of the abdomen and pelvis performed at St. Michael Health System that revealed a "**10x14 mm left para-aortic retroperitoneal lymph node**" indicating a metastatic adenopathy or "cancer lymph node" – a further indication of high-grade, metastatic cancer.

29.    Thirteen days later, on November 2, 2017, BOP employee, Jeremy Dougan, FNP, gave Mr. Adams an oncology referral for his known cancer.

30.    On November 9, 2017, Mr. Adams requested his medical records to provide them to his mother because he suspected he might remain on a medical hold because of his cancer diagnosis while simultaneously being deprived of any substantive cancer treatment, including down-staging therapy, such as chemotherapy or radiation.

31.    On November 30, 2017, Mr. Adams presented to Oncologist and Internal Medicine Specialist, Dr. Ed Eichler, M.D.

32.    However, on that date, the prior pathology results that "**show liposarcoma**" from September 29, 2017, were not provided to Dr. Eichler by the BOP or Jeremy Dougan. Thus, Dr. Eichler did not know about the already existing cancer pathology finding and confirmation. Moreover, the BOP did not provide Dr. Eichler with the CT scan of Mr. Adams's abdomen and pelvis showing metastatic adenopathy and "cancer lymph nodes," which were received by the BOP on October 20, 2017.

33.    Both of these failures by the BOP and its employees constitute negligence.

6

34.    Because Dr. Eichler was not provided the pathology results of the CT results from the BOP, Dr. Eichler was forced to order further diagnostic and radiological studies that the BOP already had in their possession but failed to provide, including a PET/CT scan "for staging," because he didn't know prior imaging and pathology had been performed.

35.    On December 12, 2017, Dr. Eichler reviewed the PET/CT scan with Mr. Adams. In essence, Mr. Adams was riddled with high-grade, metastatic cancer and had been for some time. The PET/CT scan revealed an 11 mm paraoesophageal node in the mid chest with metastatic adenopathy, a 1.7 cm left inguinal node with reactive adenopathy and neoplasm, and tiny left-sided lung nodules measuring up to 6 mm.

36.    On the same day, Dr. Eichler ordered a CT-directed needle biopsy of the 10x14 mm left para-aortic retroperitoneal lymph node.

37.    On December 19, 2017, Federal Public Defender, Molly Sullivan, wrote Federal Public Defender, Jennifer Horan, stating: "Mr. Adams is a former client of mine. He is scheduled to be released in February of 2018. However, his mother called me on Friday to inform me that he is dying and is eaten up with cancer. She is very concerned he won't live to be released."

38.    On January 9, 2018, biopsy confirmed the already well-known diagnosis of high-grade, metastatic liposarcoma.

39.    Dr. Ed Eichler recommended that Mr. Adams receive downstaging therapy – chemotherapy or radiation – to treat Mr. Adams's metastatic cancer.

40.    On January 10, 2018, Federal Public Defender, Molly Sullivan, wrote the Supervisory Attorney with the DOJ and BOP, J.D. Crook, an email that read: "Mrs. Adams has informed me that her son, Douglas, has been diagnosed with an **aggressive form of cancer**. According to her, he was misdiagnosed last year. He was **denied release** to her (I believe in lieu

of halfway house time) **due to a medical hold**. She informs me that **he is not receiving treatment**. I am aware that his release date is approaching, but I am wondering if there is **a possibility that the medical hold may be lifted and he can be released to his mother so that he may receive treatment**." (emphasis supplied).

41.    On January 11, 2018, Supervisory Attorney with the DOJ and BOP, J.D. Crook, responded: "Good Morning, Let me do some checking and I'll get back with you. **The inmate is currently receiving medical treatment and recently had a biopsy. The medical hold was placed on him when the medical issue was discovered**. I think we'll know more, once we get the biopsy back and a report from the outside medical providers." (emphasis supplied).

42.    Despite Mr. Crook's statements, the biopsy had already confirmed high-grade, metastatic cancer, and Mr. Adams was not receiving any cancer treatment whatsoever.

43.    On January 11, 2018, a UAMS biopsy also confirmed: "High grade malignant neoplasm with extensive rhabdomyosarcomata differentiation, compatible with metastatic dedifferentiated liposarcoma" with a note that "cases of dedifferentiated liposarcoma  with myogenic differentiation are believed to possess a higher potential for aggressive behavior."

44.    On January 15, 2018, Dr. Ed Eichler wrote a letter to FCI and Jeremy Dougan stating: "A CT-directed biopsy of the para-aortic adenopathy was performed on January 9, 2018, with final pathology confirming a round cell variant of high-grade liposarcoma. **It is my understanding Mr. Adams will be transferred to the FCI medical facility in South Carolina as a result of this pathologic finding**." (emphasis supplied).

45.    On January 18, 2018, Dr. Ed Eichler wrote another letter to FCI and Jeremy Dougan following up that Mr. Adams needed a transfer and treatment for high-grade, metastatic cancer. Dr. Eichler stated: "Mr. Adams is not a current surgical candidate due to the extent and

8

location of the disease in the para-aortic region. However, the patient ought to be considered for **down-staging therapy**." (emphasis supplied). Dr. Eichler included a flow chart that explains guidelines for downstaging therapy, including chemotherapy or radiation, as well as guidelines in the absence of downstaging therapy, including palliative care options: chemotherapy, radiation, surgery for symptom control, supportive care, or observation, if asymptomatic.

46.     On January 18, 2018, Dr. Eichler goes on to write again: "**It is my understanding Mr. Adams is to be transferred to the Federal Correction Institution (FCI) medical facility in South Carolina for further evaluation and possible treatment**..." (emphasis supplied).

47.     On January 23, 2018, BOP employee, Jeremy Dougan, reviewed Dr. Eichler's January 18, 2018 letter, marked the letter reviewed and made a notation in handwriting indicating Mr. Adams's set release date of February 28, 2018. Mr. Dougan did not make a Clinical Health – Administrative Note, did not attempt to transfer Mr. Adams to the FCI Correctional Institute in South Carolina, nor did he try to provide Mr. Adams any other cancer down-staging therapy through another cancer treating provider.

48.     On January 31, 2018, Mr. Adams again followed up with a BOP clinical visit for treatment of his high-grade, metastatic cancer. The Clinical Health – Administrative Note on that date notes that Mr. Adams had four (4) weeks left on his sentence. It also noted: "Pathology stage was pT2bpNX." However, no transfer was initiated, no down-stating therapy was provided, no oncology referral was provided, no palliative care was provided, and no medicine was prescribed for the excruciating pain caused by Mr. Adams's cancer.

49.    On February 8, 2018, Mr. Adams had a BOP clinical visit because he was experiencing sparce, hard bowel movements. He also had lower back, left flank, and abdominal pain. He was transferred to the emergency room for evaluation and treatment.

50.    On that day in the Emergency Department at Collom & Carney/CHRISTUS St. Michael Health System, medical records note: "Pt states he had a testicular mass last year that was finally resected in October 2017. Pathology returned liposarcoma. Pt states he has not begun therapy for this 2/2 what he believes is the fact that he's being released soon. Pt states that 3 weeks ago he began to have significant back pain that was refractory…He was unable to lie flat for two weeks. Furthermore he has not had a BM in 3 days. On arrival pt is found to have metastatic lesions suspected to be 2/2 his known Liposarcoma. Also found to have obstructive uropathy with hydronephrosis…"

51.    The impression of the CT performed on that same day reads:

1.  Abnormal bulky left supraclavicular, axillary, and mediastinal adenopathy.
2.  Abnormal large left retroperitoneal mass as described above with partial encasement of distal abdominal aorta. Invasion into psoas muscle cannot be excluded on this limited exam. Consider follow-up MR imaging. Findings worrisome of liposarcoma with metastatic adenopathy.
3.  Associated left obstructive uropathy.
4.  Additional retrocrual and left inguinal adenopathy.

52.    On the same day, Mr. Adams was treated by a urology team that found: "Inmate presents to ER with left flank pain he states has been going on for the last month. He states he has been unable to sleep. He has been made aware of the large mass noted in his abdomen. Reviewed that this mass appears to be obstructing his left ureter. Anatomy, significance of this obstruction affecting kidney function as well as importance of ensuring adequate function of left kidney long term in even of with oncologic treatments for mass were discussed…" Nephrostomy

tubes were placed to treat the ureter and kidney obstruction caused the by the cancer mass in Mr. Adams's abdomen.

53. On the same day, the Interventional Radiologist, Dr. Weerasinghe, noted: "Patient states he had a PET scan last fall that showed large retroperitoneal masses. CT scan from today show supraclavicular, axillary, and mediastinal LNA, large left retroperitoneal mass that encases abdominal aorta, and left obstructive uropathy."

54. On that same day, Dr. Prasanna Kumar noted: "Patient seen and examined and reviewed the path report from the hospital where biopsy of the lesion done. Dr. Jordan consulted for the treatment of the Liposarcoma of the posterior wall of the abdomen with secondaries in the neck, mediastinum, and abdomen. The mass obstruction of the outflow of the left kidney. Patient underwent placement of a nephrostomy tube."

55. On the following day, February 9, 2018, under "Significant Findings/Hospital Course" the medical record states: "Surgery was called and they recommended no intervention for now until pt is established with oncology. Dr. Jordan with oncology recommended pt get established the center for Cancer and blood disorders as an outpatient to initiate his plan for chemo and radiation. Records were received from the federal prison confirming his diagnosis and staging. At the time of discharge a call was made to the Center for Cancer care and blood disorders to initiate his care. His records and information were faxed there and they reported they would get him set up with an appointment..." Below are the relevant medical issues and treatment plans: "**Metastatic Cancer, Suspected Liposarcoma of Testicle as primary.**"

56. On that same day, Dr. Kumar signed his attestation stating: "Oncology consult with center for cancer care. Patient is being discharged to Kindred Long Term Care. Oncologist will make appointment to start treatment next week."

57.     Despite this note, FCI never allowed Mr. Adams to receive treatment at the Center for Cancer Care. No chemotherapy or radiation was provided to Mr. Adams. No transfer was initiated, and no referral was carried out.

58.     Between February 9, 2018, and February 15, 2018, Mr. Adams was treated at Kindred Long Term Care.

59.     On February 15, 2018, Dr. Michael Ross, M.D., Oncologist, wrote to the FCI that Mr. Adams had reached the point of having an incurable malignancy, causing severe pain and symptoms, which would cause his death in less than six months. Dr. Ross advised for Mr. Adams to be released to UAMS for initiation of chemotherapy and pain management.

60.     On February 17, 2018, the FCI medical record notes: "Inmate admitted to unit for assistance with ADL's...Inmate is able to stand and pivot to wheelchair but states it hurts too much to walk. Inmate complained of difficulty urinating since midnight."

61.     On February 20, 2018, the FCI medical record notes, "56 y/o male with recent diagnosis in October 2017 for liposarcoma with distant metastasis involving the Lymph nodes, Retroperitoneal area, Left Supraclavicular and mediastinal areas, Obstructive Uropathy on the Left with Hydronephrosis s/p Nephrostomy Tube placement, Urgency, cancer pain on the affected areas, HTN, Hyperlipidemia."

62.     On February 21, 2018, Mr. Adams's condition required him to go on a soft diet.

63.     Finally, on March 2, 2018, Mr. Adams was released from custody, via ambulance, to be taken to UAMS for emergent cancer treatment. The EMS record notes: "Pt complains of pain all over secondary to having liposarcoma. Pt request transport to UAMS for treatment and evaluation."

64.     From March 2, 2018, to September 4, 2018, Mr. Adams was finally able to receive cancer treatment at UAMS until the malignancy overcame him and caused his death on September 4, 2018.

## V. CAUSE OF ACTION

### A. Negligence

65.     Plaintiff adopts, re-alleges and incorporates each and every paragraph above as if set forth fully herein.

66.     Under the FTCA, the United States of America, in tort claims, is liable to the Plaintiff in the same manner and to the same extent as a private individual under like circumstances. 28 U.S.C. §§ 1346(b) & 2674.

67.     Federal employees, in the course and scope of their employment with the BOP, DOJ, and United States of America, negligently and carelessly failed to provide cancer treatment to Mr. Adams despite a known cancer diagnosis from multiple physicians, recommendations for treatment from multiple oncologists, and actual notice of his condition and lack of treatment, provided by physicians and Federal Public Defender, Molly Sullivan, as alleged herein.

68.     The United States of America and its employees owed a duty to Mr. Adams to use ordinary care for his safety. *Richard v. United States*, 369 U.S. 1, 9-10 (1962); 28 U.S.C. §§ 1346(b) & 2674. It was foreseeable to the BOP and federal employees and the United States of America that, if federal employees breached their duty of care owed to Mr. Adams, he would experience injuries and have recourse in federal court for injuries received by said breach of duty.

69.     Federal employees, while in the course and scope of their employment with the BOP, DOJ, and United States of America, breached multiple duties of care owed to Mr. Adams,

committing negligent, careless or wrongful acts or omissions, including, but not limited to, the following:

    (a)    Failing to provide reasonable and urgent cancer treatment;

    (b)    Failing to provide a cancer transfer;

    (c)    Holding Mr. Adams on a medical hold while simultaneously depriving him of any substantive cancer treatment; and

    (d)    Failing to comply with multiple physicians' orders for urgent cancer treatment and transfer for cancer treatment facilities.

## VI. PROXIMATE CAUSE

70.    Plaintiff incorporates each and every paragraph above as if set forth fully herein.

71.    Mr. Adams's damages were a probable and natural consequence of the aforementioned negligent or wrongful acts and/or omissions, which are directly imputed to Defendant under the doctrine of vicarious liability or *respondeat superior*.

72.    Mr. Adams's damages were directly and proximately caused by the above-articulated negligent or wrongful acts and/or omissions.

## VII. COMPENSATORY DAMAGES

73.    Plaintiff is entitled to the following measures of damages:

    (a)    The nature, extent, duration, and permanency of his injuries;

    (b)    The full extent of the injuries sustained;

    (c)    The aggravation of any pre-existing condition(s);

    (d)    Pain, suffering, emotional and mental anguish experienced in the past, in the present and reasonably expected to be experienced in the future;

(e)     Hedonic damages and loss of enjoyment of life, including physical and emotional pain and suffering;

(f)     Loss of life; and

(g)     All other damages available for the personal injuries sustained by Mr. Adams under applicable law.

## VIII. DEMAND AND PRAYER

74.     Plaintiff demands judgment against Defendant United States of America for monetary and compensation damages for the negligence alleged herein, pursuant to the FTCA, in accordance with her administrative claim, and for consideration of additional information and evidence not reasonably discoverable at the time of presenting the claim to BOP; for costs and expenses, reasonable and appropriate attorneys' fees, pursuant to and as permitted by the FTCA, codified at 28 U.S.C. §§ 2671-2680, in particular, §§ 2678, 1346(b), or other applicable code or statutory attorney's fees provision; interest, and for all other proper relief to which she is entitled.

Respectfully submitted,

By: _____

J. Reid Byrd
Bar Number 2016219
Attorney for Plaintiff
Law Offices of J. Reid Byrd, PLLC
P.O. Box 7953
Little Rock, AR 72207
P: (501) 318-8003
E: reid@byrdfirm.net
-and-
_____
Tim Reed
Bar Number 2012210
Attorney for Plaintiff
REED FIRM, P.A.
400 W. Capitol Ave, Ste. 1700
Little Rock, AR 72201
P: 501-400-7919
E: tim@reedfirmpa.com

15

| CLAIM FOR DAMAGE, INJURY, OR DEATH | INSTRUCTIONS: Please read carefully the instructions on the reverse side and supply information requested on both sides of this form. Use additional sheet(s) if necessary. See reverse side for additional instructions. | FORM APPROVED OMB NO. 1105-0008 |
|---|---|---|

| 1. Submit to Appropriate Federal Agency: | 2. Name, address of claimant, and claimant's personal representative if any. (See instructions on reverse). Number, Street, City, State and Zip code. |
|---|---|
| Department of Justice<br>Federal Bureau of Prisons | Barbara Adams, Administrator of the Estate of Douglas M. Adams III, deceased<br>104 East Vine<br>Russell, Arkansas 72139 |

| 3. TYPE OF EMPLOYMENT<br>☐ MILITARY  ☒ CIVILIAN | 4. DATE OF BIRTH<br>07/13/1962 | 5. MARITAL STATUS<br>Single | 6. DATE AND DAY OF ACCIDENT<br>09/04/2018   Tuesday | 7. TIME (A.M. OR P.M.)<br>Unknown |
|---|---|---|---|---|

**8. BASIS OF CLAIM** (State in detail the known facts and circumstances attending the damage, injury, or death, identifying persons and property involved, the place of occurrence and the cause thereof. Use additional pages if necessary).

The Bureau of Prisons withheld necessary medical care and committed medical negligence, failing to timely diagnose and properly treat the condition of Doug Adams, deceased, a prisoner, in violation of his constitutional and civil rights. A claim for these violations survives Doug Adams's death. Further, Doug Adams died because he was not allowed to obtain necessary medical care, and therefore a wrongful death claim obtains.

**9.**                                          **PROPERTY DAMAGE**

NAME AND ADDRESS OF OWNER, IF OTHER THAN CLAIMANT (Number, Street, City, State, and Zip Code).

N/A

BRIEFLY DESCRIBE THE PROPERTY, NATURE AND EXTENT OF THE DAMAGE AND THE LOCATION OF WHERE THE PROPERTY MAY BE INSPECTED. (See instructions on reverse side).

N/A

**10.**                             **PERSONAL INJURY/WRONGFUL DEATH**

STATE THE NATURE AND EXTENT OF EACH INJURY OR CAUSE OF DEATH, WHICH FORMS THE BASIS OF THE CLAIM. IF OTHER THAN CLAIMANT, STATE THE NAME OF THE INJURED PERSON OR DECEDENT.

Please see Number 8 above, along with the attached SF-95 addendum and enclosed thumb drive containing supporting documents. The decedent's name is Douglas M. Adams III. Mr. Adams died on September 4, 2018.

**11.**                                          **WITNESSES**

| NAME | ADDRESS (Number, Street, City, State, and Zip Code) |
|---|---|
|  |  |

| 12. (See instructions on reverse). | **AMOUNT OF CLAIM** (in dollars) | | |
|---|---|---|---|
| 12a. PROPERTY DAMAGE | 12b. PERSONAL INJURY | 12c. WRONGFUL DEATH | 12d. TOTAL (Failure to specify may cause forfeiture of your rights). |
| 0.00 | 500,000.00 | 500,000.00 | 1,000,000 |

I CERTIFY THAT THE AMOUNT OF CLAIM COVERS ONLY DAMAGES AND INJURIES CAUSED BY THE INCIDENT ABOVE AND AGREE TO ACCEPT SAID AMOUNT IN FULL SATISFACTION AND FINAL SETTLEMENT OF THIS CLAIM.

| 13a. SIGNATURE OF CLAIMANT (See instructions on reverse side).<br>*Tim Reed, Attorney for Estate Administrator* | 13b. PHONE NUMBER OF PERSON SIGNING FORM<br>501-951-2762 | 14. DATE OF SIGNATURE<br>11/11/2019 |
|---|---|---|

| CIVIL PENALTY FOR PRESENTING FRAUDULENT CLAIM | CRIMINAL PENALTY FOR PRESENTING FRAUDULENT CLAIM OR MAKING FALSE STATEMENTS |
|---|---|
| The claimant is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, plus 3 times the amount of damages sustained by the Government. (See 31 U.S.C. 3729). | Fine, imprisonment, or both. (See 18 U.S.C. 287, 1001.) |

Authorized for Local Reproduction
Previous Edition is not Usable

95-109

NSN 7540-00-634-4046

STANDA...
PRESCRI...
28 CFR 14...



**EXHIBIT**
**A**

## INSURANCE COVERAGE

In order that subrogation claims may be adjudicated, it is essential that the claimant provide the following information regarding the insurance coverage of the vehicle or property.

15. Do you carry accident Insurance?  ☐ Yes    If yes, give name and address of insurance company (Number, Street, City, State, and Zip Code) and policy number.  ☒ No

N/A

16. Have you filed a claim with your insurance carrier in this instance, and if so, is it full coverage or deductible?  ☐ Yes  ☒ No

N/A

17. If deductible, state amount.

18. If a claim has been filed with your carrier, what action has your insurer taken or proposed to take with reference to your claim? (It is necessary that you ascertain these facts).

N/A.

19. Do you carry public liability and property damage insurance?  ☐ Yes    If yes, give name and address of insurance carrier (Number, Street, City, State, and Zip Code).  ☒ No

N/A.

## INSTRUCTIONS

**Claims presented under the Federal Tort Claims Act should be submitted directly to the "appropriate Federal agency" whose employee(s) was involved in the incident.  If the incident involves more than one claimant, each claimant should submit a separate claim form.**

### Complete all items - Insert the word NONE where applicable.

A CLAIM SHALL BE DEEMED TO HAVE BEEN PRESENTED WHEN A FEDERAL AGENCY RECEIVES FROM A CLAIMANT, HIS DULY AUTHORIZED AGENT, OR LEGAL REPRESENTATIVE, AN EXECUTED STANDARD FORM 95 OR OTHER WRITTEN NOTIFICATION OF AN INCIDENT, ACCOMPANIED BY A CLAIM FOR MONEY DAMAGES IN A **SUM CERTAIN** FOR INJURY TO OR LOSS OF PROPERTY, PERSONAL INJURY, OR DEATH ALLEGED TO HAVE OCCURRED BY REASON OF THE INCIDENT. THE CLAIM MUST BE PRESENTED TO THE APPROPRIATE FEDERAL AGENCY WITHIN **TWO YEARS** AFTER THE CLAIM ACCRUES.

**Failure to completely execute this form or to supply the requested material within two years from the date the claim accrued may render your claim invalid. A claim is deemed presented when it is received by the appropriate agency, not when it is mailed.**

If instruction is needed in completing this form, the agency listed in item #1 on the reverse side may be contacted.  Complete regulations pertaining to claims asserted under the Federal Tort Claims Act can be found in Title 28, Code of Federal Regulations, Part 14. Many agencies have published supplementing regulations.  If more than one agency is involved, please state each agency.

The claim may be filled by a duly authorized agent or other legal representative, provided evidence satisfactory to the Government is submitted with the claim establishing express authority to act for the claimant.  A claim presented by an agent or legal representative must be presented in the name of the claimant.  If the claim is signed by the agent or legal representative, it must show the title or legal capacity of the person signing and be accompanied by evidence of his/her authority to present a claim on behalf of the claimant as agent, executor, administrator, parent, guardian or other representative.

If claimant intends to file for both personal injury and property damage, the amount for each must be shown in item number 12 of this form.

The amount claimed should be substantiated by competent evidence as follows:

*(a)* In support of the claim for personal injury or death, the claimant should submit a written report by the attending physician, showing the nature and extent of the injury, the nature and extent of treatment, the degree of permanent disability, if any, the prognosis, and the period of hospitalization, or incapacitation, attaching itemized bills for medical, hospital, or burial expenses actually incurred.

*(b)* In support of claims for damage to property, which has been or can be economically repaired, the claimant should submit at least two itemized signed statements or estimates by reliable, disinterested concerns, or, if payment has been made, the itemized signed receipts evidencing payment.

*(c)* In support of claims for damage to property which is not economically repairable, or if the property is lost or destroyed, the claimant should submit statements as to the original cost of the property, the date of purchase, and the value of the property, both before and after the accident.  Such statements should be by disinterested competent persons, preferably reputable dealers or officials familiar with the type of property damaged, or by two or more competitive bidders, and should be certified as being just and correct.

*(d)* **Failure to specify a sum certain will render your claim invalid and may result in forfeiture of your rights.**

## PRIVACY ACT NOTICE

This Notice is provided in accordance with the Privacy Act, 5 U.S.C. 552a(e)(3), and concerns the information requested in the letter to which this Notice is attached.
   A. *Authority:* The requested information is solicited pursuant to one or more of the following: 5 U.S.C. 301, 28 U.S.C. 501 et seq., 28 U.S.C. 2671 et seq., 28 C.F.R. Part 14.

B. *Principal Purpose:* The information requested is to be used in evaluating claims.
C. *Routine Use:* See the Notices of Systems of Records for the agency to whom you are submitting this form for this information.
D. *Effect of Failure to Respond:* Disclosure is voluntary. However, failure to supply the requested information or to execute the form may render your claim "invalid."

## PAPERWORK REDUCTION ACT NOTICE

This notice is <u>solely</u> for the purpose of the Paperwork Reduction Act, 44 U.S.C. 3501. Public reporting burden for this collection of information is estimated to average 6 hours per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information.  Send comments regarding this burden estimate or any other aspect of this collection of information, including suggestions for reducing this burden, to the Director, Torts Branch, Attention:  Paperwork Reduction Staff, Civil Division, U.S. Department of Justice, Washington, DC  20530 or to the Office of Management and Budget.  Do not mail completed form(s) to these addresses.

**STANDARD FORM 95** REV. (2/2007) **BACK**

## SF-95 PERSONAL INJURY/WRONGFUL DEATH ADDENDUM

### *Douglas M. Adams III*

On July 31, 2017, Mr. Adams, a federal prisoner whose medical treatment was overseen and controlled by the Federal Bureau of Prisons ("BOP"), was taken to Christus St. Michael Hospital in Texarkana, Arkansas, where an exam of his left testicle indicated a possible cancerous condition.

In September 2017, Mr. Adams was advised to have a left orchiectomy due to a suspected residual hematoma and possible malignancy, and the procedure was scheduled for that month. Just prior to the procedure, the evidence shows that Mr. Adams, who was set to be released on September 26, 2017, was placed on medical hold by the BOP.

Federal Public Defender, Molly Sullivan, Esq., will testify, based on her experience, that Mr. Adams's medical hold was abnormal and that most of her clients in the same situation, based on the sentencing and time served, would have been released to a halfway house and allowed to seek their own treatment.

On September 29, 2017, it was confirmed that Mr. Adams suffered **"dedifferentiated lipasarcoma with round cell liposarcoma and pleomorphic sarcoma-like features."** This cancer can spread very rapidly into other parts of the body. Mr. Adams's left testicle was removed.

Post-orchiectomy, an October 20, 2017 abdomen CT revealed a **"10x14 left para-aortic mm retroperitoneal lymph node" with probable "metastatic adenopathy."** Mr. Adams was referred to oncology on November 2, 2017. On December 12, 2017, a CT scan revealed cancerous lymph nodes in the perineum, chest, inguinal node and left-sided lung nodules, and on December 14, 2017, a biopsy of the retroperitoneal lymph node was performed. In January 2018, it was determined that the biopsy was positive for sarcoma.

The evidence shows that, in a January 10, 2018 email, after learning of the January 2018 diagnosis and the failure to diagnose of September 2017, Molly Sullivan reached out to J.D. Crook, counsel for the BOP, and stressed the fact that Mr. Adams was not receiving medical care and requested that the medical hold be lifted so he could be released to obtain proper medical care. Between October 17, 2017, and January 10, 2018, Mr. Adams received absolutely no care for his cancer, subjecting him to a grave risk of death.

On January 15, 2018, Dr. Ed Eichler, Oncologist, wrote a letter the BOP/Federal Corrections Institute insisting Mr. Adams needed to be transferred to the FCI medical facility in South Carolina immediately for cancer treatment. Again, on January 18, 2018, Dr. Eichler, wrote another letter to the BOP/Federal Corrections Institute insisting that Mr. Adams needed to be transferred to the FCI facility in South Carolina for chemotherapy and/or radiation treatment.

The BOP never transferred Mr. Adams. The BOP never allowed downstaging therapy to be administered to Mr. Adams; although, his treating oncologist wrote two letters insisting it was necessary and urgent. The options for Mr. Adams at that time included chemotherapy, radiation

1

and surgery for symptom control. The BOP refused to allow treatment to Mr. Adams, refusing even pain medication, cold-heartedly concluding that Mr. Adams was "drug seeking." To the contrary, however, Mr. Adams's physical condition was absolutely clear. He could hardly walk or talk and had lost significant weight. Mr. Adams died on September 4, 2018.

For five months the BOP knew Mr. Adams had cancer and provided him absolutely no treatment, effectively and arbitrarily increasing his sentence from three years to death. The BOP directed and controlled Mr. Adams's diagnosis and treatment timeline, dragging its feet all the way. There were signs and symptoms of Mr. Adams's condition in 2017, and the BOP simply placed Mr. Adams on a medical hold instead of releasing him, in which case he could've sought and obtained proper medical care. The BOP erected barriers to a proper diagnosis and put in place a system that allowed for delayed diagnosis and discovery. The BOP then failed to provide proper care once Mr. Adams's condition was discovered.

The negligence of the BOP resulted in a decreased chance of survival for Mr. Adams and proximately caused his death. Once his condition was finally properly diagnosed, the BOP's negligence then resulted in deprivation of proper treatment, in violation of Mr. Adams's basic human and constitutional rights. When Mr. Adams was finally released from prison, the effects of proper treatment at the University of Arkansas Medical Sciences were immediately beneficial and allowed him to survive with his family an additional seven months. Had the BOP allowed for a timely diagnosis and a proper course of treatment, as advised by the oncologist, Mr. Adams would still be with his family today.

Respectfully submitted,

Tim Reed, Esq.
Reed Firm, P.A.
400 W. Capitol Ave., Ste. 1700
Little Rock, Arkansas 72201
P: 501-400-7919
F: 501-340-0678
tim@reedfirmpa.com

2

## **AUTHORIZATION OF LEGAL REPRESENTATION**

I, Barbara Adams, Parent and Next Friend of Douglas Adams, deceased, hereby authorize J. Reid Byrd and Tim Reed, to present, on my behalf, a Standard Form 95 to the United States Government in order to initiate all claims and pursue all causes of action on behalf of Douglas Adams.

_Barbara Adams_

Barbara Adams
Parent and Next Friend of Douglas Adams, deceased

11-11-19
Date

Accepted by:

_J. Reid Byrd_
J. Reid Byrd
Law Offices of J. Reid Byrd, PLLC
P.O. Box 7953
Little Rock, AR 72207

and

_Tim Reed_
Tim Reed
Reed Firm, P.A.
P.O. Box 56199
Little Rock, AR 72215



### IN THE CIRCUIT COURT OF WHITE COUNTY, ARKANSAS
### PROBATE DIVISION

IN THE MATTER OF THE ESTATE OF
DOUGLAS M. ADAMS III, DECEASED                    CASE NO. 73PR-19-137

### <u>LETTERS OF ADMINISTRATION</u>

Be it known that Barbara Adams, whose address is 104 East Vine, Russell, Arkansas

72139, in White County, having been duly appointed Administrator of the Estate of Douglas M.

Adams III, deceased, who died on or about September 4, 2018, and having qualified as

Administrator, is hereby authorized to act as such for, and on behalf of, the Estate and statutory

beneficiaries, and to take possession of the property thereof as authorized by law.

Issued this ___10th___ day of ___May_____, 2019.


                                        _Carla Erwin by S Coon, DC_
                                        White County Clerk

[Seal/Certification]

# Proof of Delivery

Dear Customer,

This notice serves as proof of delivery for the shipment listed below.

**Tracking Number**

1Z1698VV0296934563

**Weight**

0.00 LBS

**Service**

UPS 2nd Day Air®

**Shipped / Billed On**

11/11/2019

**Delivered On**

11/14/2019 9:52 A.M.

**Delivered To**

320 1ST ST NW
WASHINGTON, DC, 20534, US

**Received By**

LOYD

**Left At**

Mail Room

Thank you for giving us this opportunity to serve you. Details are only available for shipments delivered within the last 120 days. Please print for your records if you require this information after 120 days.

Sincerely,

UPS

Tracking results provided by UPS: 12/02/2019 1:45 P.M. EST



EXHIBIT

B